**2017 UT App 150**

## THE UTAH COURT OF APPEALS

HEIDI KIRSTEN VANDERZON,
Appellant,

*v.*

JOHN MATTHIAS VANDERZON,
Appellee.

Opinion
No. 20140946-CA
Filed August 17, 2017

Third District Court, Silver Summit Department
The Honorable Todd M. Shaughnessy
No. 114500013

Diana J. Huntsman, Sherri L. Walton, Jason T.
Schow, Michael D. Zimmerman, Julie J. Nelson, and
Clemens A. Landau, Attorneys for Appellant

David S. Dolowitz, James M. Hunnicutt, and Shane
A. Marx, Attorneys for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
JILL M. POHLMAN concurred. [1] JUDGE GREGORY K. ORME concurred
in the result.

ROTH, Judge:

¶1 Heidi Kirsten Vanderzon and John Matthias Vanderzon[2]
divorced by bifurcated decree in March 2013. Several issues were

---

1. Judge Stephen L. Roth participated in this case as a member of
the Utah Court of Appeals. He retired from the court before this
decision issued.

2. Because they share a last name, we refer to the parties
individually by their first names for convenience.

reserved for trial following entry of the decree, including child custody, alimony, and attorney fees. In September 2014, the trial court issued its final decree of divorce, which addressed all of the remaining issues. Heidi appeals from that decree, challenging the court's orders regarding custody, alimony, and attorney fees. We affirm in part and vacate in part and remand.

BACKGROUND

¶2    Heidi and John married in Virginia in 1997, where they continued to live for many years. In 2008, Heidi moved with their three children to Park City, Utah, while John remained in Virginia. The couple formally separated two years later, and Heidi filed for divorce in Utah in January 2011.

¶3    Following the entry of the bifurcated decree of divorce, a bench trial was held during which the court heard evidence related to the issues remaining between the parties, including child custody, alimony, and attorney fees. On September 5, 2014, the court issued its findings of fact and conclusions of law as well as its final decree of divorce, which resolved all remaining issues.

*Custody*

¶4    The court awarded the parties joint legal custody of the children and established a joint physical custody arrangement under which John would have substantial parent time but Heidi would remain the children's primary caregiver. At the time of the trial in 2014, the parties had been living separately for over five years. Heidi rented a home in Park City, Utah, where she cared for all three of the parties' minor children, who attended school nearby. John continued to live in Virginia, working as he had for many years in the Washington, D.C. area. After Heidi moved to Park City, John traveled to Utah on weekends to see his family. However, once the divorce proceedings began, John's

access to his children and the parties' long-distance co-parenting efforts became a significant source of conflict.

¶5     A custody evaluator, Dr. Valerie Hale, was appointed to address the custody issues in the case. Her evaluation included "numerous interviews with Heidi and John" and their children, as well as on-site home visits in both Utah and Virginia. She prepared a "detailed and exhaustive report" and testified at trial. Dr. Hale recommended "that the children go back to Virginia." She stated that the "distance between the parents hasn't been working for a variety of reasons on a variety of levels" and noted that the children "didn't express an intense attachment . . . to Park City," but had instead communicated "a temporary feeling." She emphasized the importance of providing the children with as stable and complete a relationship as possible with each of their parents, which would include ready access to both John and Heidi, along with proximity to relatives, most of whom lived in the eastern United States. She stated that it was particularly important that the children "get to have access to Dad and Mom . . . in a spontaneous way, . . . not according to a strict schedule but in a way that lets them approximate as naturally as they can the need to exploit each parent."

¶6     When asked how far divorced parents could live from each other and still manage the kind of parental interaction she recommended, Dr. Hale cited research that indicated that "if parents live more than 75 miles apart, . . . the non-residential parent participation . . . drops off precipitously," and that "parents being within 45 minutes' drive" is ideal, because it allows for "natural flexibility" in parenting. Noting that Virginia is "traffic-y," Dr. Hale ultimately recommended that Heidi should live within forty-five minutes of John if she relocated to northern Virginia.

¶7     In reaching its custody determination, the court "relie[d] heavily" on Dr. Hale and found "her written report and [testimony] at trial to be thoughtful, thorough, and sound." The

court decided that a joint physical custody arrangement was in the best interests of the children, with Heidi as the primary caregiver. The court also determined that it was in the children's best interests to relocate with Heidi to Virginia where John resided. For most of the divorce proceeding, Heidi had indicated that she was not willing to move back to Virginia, but on the second day of trial she told the judge that if he ultimately ordered the children to be relocated to Virginia, she would "follow the children and be with the children." In its final decree, the court noted that Heidi had "voluntarily agreed to relocate to Virginia so that she can continue to act as the primary caregiver for the children."

¶8     The court included in its findings and its final decree certain provisions designed to facilitate the children's transition from Utah to Virginia. The court emphasized that the transition "must be handled carefully and responsibly and with as little disruption to the children as is possible," and to that end the decree ordered the parties to "develop a transition plan" with the assistance of a transition specialist. The decree required the parties to complete the children's move to Virginia "no later than January 1, 2015," but, anticipating that Heidi might not be ready to move immediately from Park City, the court made provisions for their temporary custody with John during the period between the children's relocation and Heidi's own move to Virginia. In connection with these transitional arrangements, the court made an effort to ensure that Heidi would move close enough to John to implement the custody evaluator's recommendation that the location of the children's residence facilitate spontaneous interactions with both parents: "If Heidi is not residing in Virginia and within 25 miles of John's residence at the time the children move, then the children will live with John and he will act as the primary caregiver . . . until Heidi relocates." Then, "[u]pon Heidi's relocation to Virginia within 25 miles of John's residence, the children will live with her, [and] she will resume her role as primary caregiver."

*Alimony*

¶9     The trial court ordered John to pay Heidi $6,400 per month in alimony. The court noted that it was required to consider several factors in making its alimony award, including Heidi's "financial condition and needs," Heidi's "earning capacity or ability to produce income," and John's "ability . . . to provide support." *See* Utah Code Ann. § 30-3-5(8)(a)(i)-(iii) (LexisNexis 2013). The court found that Heidi had monthly expenses of $14,758, which included $4,000 of child-related expenses that it noted were "essentially offset" by the child support award of $3,613. In deciding the appropriate amount of income to impute to Heidi, the court relied on the opinions of a vocational expert. Heidi had not worked outside the home during the marriage, but before marrying, she had obtained bachelor's degrees in History and Russian, with a minor in Soviet Studies, and she had worked as a Russian translator at a law firm from 1990 to 1997. The expert opined that, based on Heidi's college degrees and the results of vocational testing, "the best option[] for [Heidi] would be public relations specialist," which had an entry-level salary of about $34,150 yearly, or $2,846 per month before taxes and other deductions. The court ultimately imputed income in that amount to Heidi. After subtracting Heidi's gross imputed income and the monthly child support payments from her expenses, the court concluded that Heidi had $8,300 of unmet need.

¶10    The court then determined that John's monthly gross income was $26,667 per month, yielding a net income (i.e., after taxes and other deductions) of $19,733 per month. The court then deducted the $3,613 child support payment, which left John with $16,120 to pay his own expenses and support Heidi. The court then subtracted John's monthly expenses of $10,000, leaving surplus in the amount of $6,120, which it noted "is close but ultimately insufficient to satisfy . . . Heidi's unmet need" of $8,300. In arriving at its ultimate alimony determination, however, the court turned to a report and separate calculations

prepared by John's alimony expert. The report assumed that the parties would enjoy equal custody of the children. As a result, its stated goal was to equalize the parties' standards of living essentially by equalizing the parties' budgets, reasoning that both parties would need an equal monthly cash flow to provide an equal standard of living for themselves and their children. Based on a number of calculations not easily reconciled with the trial court's own findings, the report indicated, as the court noted, that "a total monthly support obligation (alimony plus child support) of $10,000 would . . . result in a net, after tax income to [Heidi] of $10,240" and to John "of $10,239." The court concluded that by using the report's total support calculation, "both parties' after tax cash flow would essentially be identical" and "would leave both parties with an essentially identical shortfall in the amounts needed to meet their monthly needs." As a result, the court adopted the report's $10,000 "monthly support obligation" figure, and, after deducting John's child support payment, ordered John to pay the rounded-up balance of $6,400 as alimony to Heidi for a period equal to the length of the marriage.

*Attorney Fees*

¶11    After the trial concluded, the court issued a May 28, 2014 minute entry (the Minute Entry), as well as its preliminary findings of fact and partial decree, which required the parties to submit proposed findings of fact and conclusions of law by July 9, 2014. The Minute Entry also set out the procedure for each party to request attorney fees:

> To the extent either party is requesting that the court allocate some but not all of their attorneys' fees or costs to the other side, or that the court require the other side to bear the fees and costs incurred in connection with particular tasks or phases of the case, they must provide a calculation of the fees and costs incurred for the particular task

or phase at issue. If a party fails to provide a separate calculation of the fees and costs incurred for particular tasks or aspects of the case, the court will not grant those fees and costs. This is because, given the time this case has been pending and the amount of fees incurred, it would be impossible for the court to try and determine from billing records alone how to allocate fees and costs to particular issues in the case. If a party is requesting that the court allocate all of their fees and costs to the other side, they may simply submit a consolidated affidavit of fees and costs. If all the court receives is a consolidated affidavit of fees and costs, it will treat this as a request to allocate all of their fees and costs to the other side.

¶12 Subsequently, Heidi requested in her proposed findings of fact that she be awarded all of her attorney fees or, in the alternative, only those fees associated with pursuing discovery related to John's employment with and sale of his interest in Sun Management, a company that John owned for a time with his brother. In her request for fees, Heidi did not provide either "a consolidated affidavit of fees and costs" to support her full fee request or "a separate calculation of the fees and costs incurred for" the Sun Management discovery. Instead, she requested that the court give her fourteen days to provide "an updated and complete affidavit of Attorney's Fees" for either her full fees or the fees related only to the Sun Management discovery. John did not request an award of his own attorney fees; rather, in his proposed findings, he stated that no fees and costs should be awarded to either party.

¶13 The court ordered that each party bear his or her own costs and attorney fees. As pertinent to this appeal, the court concluded that awarding Heidi *all* her fees would be "patently unreasonable" and "manifestly unjust" because Heidi bore "responsibility for at least half—if not more—of the excessive

fees and costs that have been incurred." The court denied Heidi's alternative request for fees associated with the Sun Management discovery for three primary reasons. First, the court found that the expenses Heidi incurred were "offset by fees and costs she forced John to incur as a result of her own litigation tactics." Second, the court noted that "technically John's brother, not John, [was] responsible for unnecessarily driving up the cost of the Sun Management discovery." And finally, "Heidi, like John, failed to comply with the court's May 28, 2014, Minute Entry and has thereby waived any right to recover this portion of her fees."

*Heidi's Post-Judgment Motion*

¶14 Following entry of the final decree of divorce, Heidi filed a motion to amend the judgment under rules 52 and 59 of the Utah Rules of Civil Procedure. Heidi requested two modifications to the court's decision relevant to this appeal. First, she asked the court to "adjust the order to allow the children to complete the current school year in Park City" rather than relocating to Virginia by January 1, 2015. Second, she asked the court "to clarify" the twenty-five-mile proximity requirement by "[i]ncreasing the radius [of the proximity requirement] to 45 miles, and/or tethering [her] location to a school within a reputable district," which she asserted "would serve the children's best interest" and would help to avoid "further court involvement." Heidi also requested that the court "clarify that [she] is not required to relocate with the children if John's decision to change his residence causes her to be outside of the radius."

¶15 The court denied Heidi's motion. First, it determined that the motion to amend was untimely. Second, the court determined that none of issues she raised "are properly the subject of a motion to amend the judgment." In particular, the court noted that the decree did not "prohibit either party from seeking relief from the court" about the transition deadline or

the "proximity of [Heidi's] residence to [John's] residence" if the "transition specialist concludes that complying with the court's orders . . . would not be in the children's best interest." As a result, the court concluded that Heidi's requests were "purely speculative."

## ISSUES

¶16  First, Heidi argues that the trial court's twenty-five-mile proximity requirement impermissibly infringes on her constitutional rights to travel and to parent because the requirement is not justified by a compelling interest or narrowly tailored to meet that interest. In particular, she claims that the court erred when it tied her award of primary physical custody to her compliance with the proximity requirement and then refused to relent by not allowing her to choose a location in Virginia "more convenient and affordable for her."

¶17  Second, Heidi argues that the trial court erred in its alimony calculations and determinations.

¶18  Third, Heidi argues that the trial court erred by denying her request for attorney fees incurred while pursuing discovery related to John's association with Sun Management.

## ANALYSIS

### I. The Twenty-Five-Mile Proximity Requirement

¶19  Heidi argues that the trial court erred when it "conditioned the grant of primary custody to her" on living within twenty-five miles of John's residence. In particular, she argues that the court's proximity requirement is unconstitutional because it infringes on her fundamental rights to travel and to parent and because the twenty-five-mile requirement "is not narrowly tailored to achieve a compelling state interest."

¶20   "We review custody determinations under an abuse of discretion standard, giving the trial court broad discretion to make an initial custody award." *Grindstaff v. Grindstaff*, 2010 UT App 261, ¶ 3, 241 P.3d 365 (citations and internal quotation marks omitted). We "will affirm the trial court's custody award so long as the trial court's discretion is exercised within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions." *Id.* (citation and internal quotation marks omitted). As we discuss below, Heidi has not preserved her constitutional arguments or persuaded us that the court plainly erred in setting the proximity requirement or refusing to alter it as she requested in her post-judgment motion.

A.    Interpretation of the Decree's Proximity Requirement

¶21   As an initial matter, Heidi characterizes the court's proximity requirement as engrafting a continuing condition on her award of primary physical custody, requiring her to forfeit custody if she chooses to live outside of the twenty-five-mile radius set by the court (or if John moves to a new residence outside of the twenty-five miles and she declines to relocate in response). As she explains it, "[t]he court overreached Heidi's agreement to live in Virginia when it conditioned the grant of primary custody to her on her living within '25 miles of John's residence,'" and she requests that we vacate the court's proximity requirement and instead instruct the court to amend its decree so that Heidi "may continue to have primary custody so long as she lives within the 45 mile radius she agreed to in her post-trial motions."[3] But we do not interpret the trial court's

_____

3. Heidi has not challenged the proximity requirement on any legal basis other than its constitutionality. As a consequence, we presume that the court's overall best interests findings—including the proximity requirement—are otherwise supported

(continued…)

order as broadly as Heidi does. Rather, the court's proximity requirement is more properly seen as an initial determination of the children's best interests in the context of the imminent relocation to Virginia, subject to modification in light of changing circumstances and aimed at ensuring that the children's transition to Virginia would be "as smooth as possible." And we believe that the trial court did not exceed its discretion in making this determination.

¶22 The court determined that the children should relocate to Virginia to be closer to John and to extended family in the area, a decision Heidi does not challenge and with which she agreed during trial. The court ordered that Heidi must live within twenty-five miles of John upon relocation to Virginia only after a careful analysis of the custody factors and the children's best interests. The court determined that "the most critical issue" related to custody was that both parties live "in close proximity to one another so that each parent [could] be meaningfully involved in the children's lives." For several years before the trial, the parties had lived across the country from each other, with the children separated geographically from John. The trial court found that, during this time, both parties had "demonstrated a very poor capacity . . . to foster a positive relationship between the children and the other parent" and that Heidi in particular had "taken unreasonable positions and ha[d] minimized the importance of John having regular, uninterrupted contact with the children." As a result, the long-distance arrangement had been "extraordinarily difficult and damaging to the children," leading the court to conclude that the proximity issue—and ensuring the opportunity for ongoing, meaningful interaction with each parent—was "[m]ore important than who

---

(…continued)
by the evidence and in accord with applicable law. *See Elmer v. Elmer*, 776 P.2d 599, 602 (Utah 1989).

was the primary caregiver." In fashioning the proximity requirement, the court relied upon the custody evaluator's recommendations. The evaluator had recommended that both parents and the children live in Virginia and that the parents reside no more than a forty-five-minute drive from each other, which she stated would be less than forty-five miles due to traffic congestion in northern Virginia near the Washington, D.C. area.

¶23 Further, the court concluded that both Heidi and John were "fit and proper parents," but it ultimately resolved their "competing claims" in Heidi's favor because she had been the children's primary caregiver. *See Thomas v. Thomas*, 1999 UT App 239 ¶ 7, 987 P.2d 603 (explaining that if there are "competing claims to custody between fit parents under the 'best interests of the child' standard, considerable weight should be given to which parent has been the child's primary caregiver" (citation and internal quotation marks omitted)). As a result, although Heidi was granted primary physical custody, she was nonetheless the relocating party, along with the children. The court accordingly determined that it would be in the best interests of the children for Heidi, upon relocating from Park City, to establish her new residence within twenty-five miles of the place where John was already residing in the Washington, D.C. area. Seen in this light, the court's decision to describe the twenty-five-mile requirement as specifically applicable to Heidi recognized the practicalities inherent in the circumstances, with the focus on establishing and maintaining the children's ready access to both parents.

¶24 The court also saw the children's transition to permanent residence in Virginia as posing particular challenges for their well-being and specifically addressed the transition process in the decree. The court ordered the children to be relocated to Virginia by January 1, 2015, and emphasized that, notwithstanding the mid-school-year transition, their move "must be handled carefully . . . with as little disruption as is

possible." The court ordered the parties to work out a transition plan with a transition specialist to ensure that the move "will be as smooth as possible." And focusing on a potential complication in the timing of Heidi's move, the court gave instructions for how the parties were to handle the transition if, "at the time the children move," "Heidi is not residing in Virginia and within 25 miles of John's residence." In that event, the court ordered, physical custody would transfer temporarily to John—"the children will live with John and he will act as the primary caregiver for the children until Heidi relocates," whereupon Heidi "will resume her role as primary caregiver."

¶25   And, significantly, following the entry of the final decree, the court indicated that the proximity requirement was based on what it determined to be the best interests of the children at the time of trial but that it was not intended to rigidly apply if the circumstances on which it was based proved materially different than anticipated, even if brought to light during the transition period. In particular, the court stated that the twenty-five-mile requirement "does not prohibit either party from seeking relief from the court in the event the transition specialist concludes that complying with the court's orders concerning the deadline for the transition or the proximity of [Heidi's] residence to [John's] residence would not be in the children's best interest." The court noted that, as a consequence, Heidi's arguments about potential issues with the twenty-five-mile requirement—issues she reasserts on appeal—were "purely speculative" at the time of her motion because neither Heidi nor the children had moved to Virginia at that point and no transition plan had yet been worked out.

¶26   Viewed in this light, the court's proximity requirement cannot reasonably be interpreted as subjecting Heidi's award of primary custody to a continuing risk of forfeiture. Rather, it was aimed at ensuring that, as an initial matter, the parties reside close enough to each other to meet the custody evaluator's recommendation for optimum parental involvement. And

because John was already settled and living in Virginia, the proximity obligation was reasonably addressed to Heidi, who would be choosing a new residence upon moving back to Virginia. The court's order was also entered before either the children or Heidi had relocated and therefore before the parties had any practical experience with the proximity requirement. Indeed, the court itself seemed to suggest that the proximity requirement was an initial determination that was flexible and could be re-evaluated in the event that the transition specialist determined it was not in the children's best interests. And the decree's provision for a change of custody to John if "Heidi is not residing in Virginia and within 25 miles of John's residence" must be interpreted in this context. It is not a continuing threat of automatic transfer of custody from Heidi to John at any time she is residing more than twenty-five miles from him. Rather, the court's order regarding temporary transfer of custody was fashioned to address potential issues surrounding the relocation of the children to Virginia and the possibility that Heidi's transition would take additional time.

¶27    Thus, in the context of the parties' circumstances, the court's best interests findings, and its transition concerns, we do not think that the decree can be reasonably interpreted to tether Heidi's residence in Virginia to a twenty-five-mile radius of wherever John might choose to live, on pain of automatically losing primary physical custody of the children to him. To be sure, Heidi is not free under the decree to simply move outside the twenty-five-mile radius without first persuading the court that it will not be detrimental to the children's interests, but neither can John force her to relocate or lose custody simply by moving further away. *Cf. Larson v. Larson*, 888 P.2d 719, 723 (Utah Ct. App. 1994) (explaining that requiring forfeiture of primary physical custody if the custodial parent chooses to move is not appropriate unless "there [is] compelling evidence" to justify a determination that removing children from their lifelong primary caregiver is in the children's best interests).

B.      Heidi's Constitutional Arguments

¶28    Heidi claims that, even though she agreed to relocate to Virginia, the court was not justified in narrowing her choice of where to live to within a twenty-five-mile radius of John's residence. In particular, she challenges the court's rejection of her proposal that the proximity requirement be expanded to forty-five miles or be defined by the bounds of a suitable school district rather than John's residence. Heidi bases her challenge to the proximity requirement on constitutional grounds, arguing that it impermissibly infringes on her constitutional rights to travel and to parent her children. John argues that Heidi has not preserved her constitutional arguments, and we agree.

¶29    "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. To preserve an issue for appeal, "the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue," *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968, and "the fact that a party is asserting constitutional claims does not excuse him from complying with the preservation rule," *Donjuan v. McDermott*, 2011 UT 72, ¶ 21, 266 P.3d 839; *see also Holgate*, 2000 UT 74, ¶ 11 (explaining that the preservation requirement applies to "constitutional questions"). We will therefore not address unpreserved constitutional claims unless the appellant "can demonstrate that exceptional circumstances exist or plain error occurred." *Holgate*, 2000 UT 74, ¶ 11 (citation and internal quotation marks omitted).

¶30    Heidi contends that her constitutional challenges were preserved because the trial court itself twice acknowledged that it did not have authority to order her to relocate from Utah to Virginia. But the trial court's statements did not mention any constitutional limitations on its authority. The court's first reference to its authority to order a parent to move was when it responded to the custody evaluator's recommendation that it

would be in the children's best interests to be "located with their mother and father in Virginia" by stating, "You understand I don't have the jurisdiction to ask Ms. Vanderzon to do anything in terms of where she lives." The trial court's second reference involved a similar statement in its findings and conclusions regarding custody that "it does not have the authority to order either parent to relocate and does not do so here"—a statement made in a footnote to its acknowledgement that the parties themselves had resolved the major issue related to proximity by each volunteering to relocate depending on which parent was awarded primary custody. While these statements certainly demonstrate that the court recognized it lacked authority to order either *parent* to move to Utah or Virginia, they cannot be interpreted to suggest that the court harbored any doubt, whether constitutionally-based or otherwise, about its authority to make determinations about the *children's* best interests, such as the optimal distance between their parents' residences. Likewise, these statements cannot be reasonably interpreted to suggest that the court had in mind the questions Heidi raises on appeal relating to her constitutional rights to travel and parent. *Cf. Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (concluding that an issue was preserved where the district court essentially provided its own opportunity to rule on an alleged error being challenged on appeal by deciding "to take up the question" itself below and "conduct[ing] a thoroughgoing analysis" of the issue). In other words, the court in this case did not "take up" the question of how to approach its best interests determinations in light of the specific constitutional rights Heidi raises on appeal. *Cf. id.*

¶31   Further, as Heidi appears to acknowledge, she did not bring her constitutional arguments to the trial court's attention during trial. Nor did she make any reference to the constitution in her motion to amend judgment, even though she raised the issue of the proximity requirement there. *Cf. Dickman Family Props., Inc. v. White*, 2013 UT App 116, ¶¶ 12–13, 302 P.3d 833

(concluding that the appellants had not preserved an argument for appeal where they had been "unambiguously alerted" during a bench hearing regarding the court's "conception" about the point of law they disputed but failed to bring their argument "to the court's attention" at that time or in their subsequent objection to the court's proposed order). Thus, it does not appear that Heidi ever presented the court with an opportunity to consider whether its twenty-five-mile proximity order was constitutionally impermissible in light of Heidi's rights to travel and to parent. *Cf. Brookside Mobile Home Park*, 2002 UT 48, ¶ 14; *see also Wolferts v. Wolferts*, 2013 UT App 235, ¶ 22, 315 P.3d 448 (concluding that the appellant did not preserve the constitutional argument she made on appeal that "limiting her participation to only cross-examination of the witnesses deprived her of her constitutional right to testify and present evidence," where she made a general objection about the court's constraints on her presentation of testimony but "did not assert [to the trial court] that she had a constitutional right" to call witnesses and testify).

¶32  Nevertheless, Heidi contends that if her constitutional arguments are unpreserved, we should review them for plain error. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful . . . ." *Holgate*, 2000 UT 74, ¶ 13 (brackets, citation, and internal quotation marks omitted). "To establish that the error should have been obvious to the trial court, the appellant must show that the law governing the error was clear at the time the alleged error was made. Thus, an error is not obvious if there is no settled appellate law to guide the trial court." *Thomas v. Mattena*, 2017 UT App 81, ¶ 13, 397 P.3d 856 (citations and internal quotation marks omitted). An error is prejudicial if, "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *Berkshires, LLC v. Sykes*, 2005 UT App 536, ¶ 21, 127 P.3d 1243 (citation and internal quotation marks omitted). Heidi

contends that the error was so obvious that the trial court even twice acknowledged "that it did not have authority to do what it ultimately did." And she argues the error was prejudicial because it "infringed upon [her] right to travel, to choose where she lives, and to parent the way she sees fit, without analysis of whether the twenty-five-mile radius was in fact justified by a compelling state interest."

¶33  We do not agree that the alleged error would have been obvious to the trial court. As we have noted, the court acknowledged only that it could not order her to relocate; it did not suggest that it could not make a custody determination about the children's best interests in light of Heidi's particular constitutional rights. And Heidi has not otherwise demonstrated that the law governing the alleged constitutional errors was clear in Utah at the time the court made its ruling. *See State v. Dean*, 2004 UT 63, ¶ 18, 95 P.3d 276 (explaining that an error was not obvious where both Utah and federal case law "was not sufficiently clear or plainly settled" on the issue being challenged); *Larsen v. Johnson*, 958 P.2d 953, 956 (Utah Ct. App. 1998) (concluding that an alleged error was not obvious under plain error review where "the law in Utah and in other jurisdictions is unsettled on this point").

¶34  For example, Heidi contends that "the federal constitutional right to travel includes the right to choose where one lives and the right to intrastate travel," and she cites several federal cases in support, including *Saenz v. Roe*, 526 U.S. 489, 500 (1999), and *Jones v. Helms*, 452 U.S. 412, 417–18 (1981). But these cases did not involve a state court's authority to decide where a child should live in the context of a best interests determination in a custody case. *E.g.*, *Saenz*, 526 U.S. at 492–98 (presenting a challenge under the Privileges or Immunities Clause of the Fourteenth Amendment to the United States Constitution to a state statute that limited the level of welfare benefits to newly-arrived state residents who had resided in the state for less than twelve months); *Jones*, 452 U.S. at 414–15 (presenting a challenge

under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to a state statute that increased the degree of offense from misdemeanor to felony if a parent willfully and voluntarily abandoned his or her dependent child and then left the state). She also contends that "[s]everal states have recognized the right of intrastate travel as a component of the right of interstate travel," citing *In re White*, 158 Cal. Rptr. 562, 567 (Cal. Ct. App. 1979), and *In re Marriage of Guffin*, 2009 MT 169, ¶ 11, 209 P.3d 225. The courts in those cases determined that there is a right to intrastate travel within their own states and under their own constitutions, but expressly noted that no such right has been found under the federal constitution. *See, e.g.*, *In re White*, 158 Cal. Rptr. at 567 & n.3; *In re Marriage of Guffin*, 2009 MT 169, ¶ 11 (explaining that "[t]he federal decisions confirming the right of interstate travel have expressly not decided whether intrastate travel is part of the same right"); *see also D.L. v. Unified School Dist. No. 497*, 596 F.3d 768, 776 (10th Cir. 2010) (explaining that, under the Fourteenth Amendment, the "substantive due process rights to travel and to establish a residence" "apply only to *interstate* travel," not intrastate travel). Heidi cites no Utah case law suggesting that the right of interstate travel has been interpreted to include the right to intrastate travel, much less in the context of a determination of a child's best interests in a custody context. Nor has she pointed us to any dispositive federal case. Thus, she essentially asks us to decide as a matter of first impression based on an analysis of federal and other-state case law that, in Utah, the Federal Constitution's right to interstate travel includes the right of intrastate travel and the right to establish a residence, and then apply this concept to circumscribe a trial court's authority in a custody case to make determinations about where children ought to reside based on their best interests under all the circumstances. To establish that the error should have been obvious to the trial court, Heidi "must show that the law governing the error was clear at the time the alleged error was

made."[4] *See Dean*, 2004 UT 63, ¶ 16. Heidi has not met that burden here.

¶35   Heidi also argues that the proximity requirement impermissibly infringes on her right to parent, which includes the right to choose where her children live and go to school. She contends that "[t]he right to parent is a fundamental right in Utah" and that Utah has recognized that an infringing action is subject to strict scrutiny review. *See Jones v. Jones*, 2013 UT App 174, ¶¶ 10–11, 25, 307 P.3d 598, *aff'd*, 2015 UT 84, 359 P.3d 603. She then argues that the court's proximity order is "not narrowly tailored to achieve a compelling state interest." However, "parental rights are not absolute," *see id.* ¶ 11, and Heidi concedes that Utah has not "determined what constitutes a 'compelling state interest' when determining whether a parent's right to custody can be conditioned on a parent living in a particular location." Nonetheless, she contends that we should "look to other areas of Utah law, and the law of other states, for guidance," essentially conceding that these contentions, too, involve a matter of first impression in Utah. It necessarily follows that it would not have been obvious to the trial court that its proximity requirement—one made in the context of its custody determinations regarding the children's best interests—impermissibly infringed on her right to parent. *See Dean*, 2004 UT 63, ¶¶ 16, 18.

¶36   Accordingly, Heidi has not borne her burden of demonstrating that the court plainly erred in failing to consider her constitutional rights to travel and parent in adopting the

---

4. Heidi also argues that the court impermissibly conditioned her primary custody award on living within twenty-five miles of John's residence by requiring her to forfeit her custody if she relocated outside of the twenty-five-mile radius. We have explained that the court's orders cannot reasonably be interpreted in the way she suggests. *Supra* ¶¶ 26–27.

proximity requirement or in declining to adopt her proposed alterations to it.

## II. The Alimony Determinations

¶37    Heidi argues that the court erred when it calculated alimony. In particular, she contends that the court erred by imputing too much income to her, calculating alimony based upon her gross rather than her net monthly income, failing to equalize the shortfall between the parties, and failing to consider the tax consequences of Heidi's alimony award. She contends that her arguments are preserved, but also that if they are not, we should review them for plain error.

¶38    As we discussed above, to preserve an issue for appeal, "the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968. Heidi appears to claim that her arguments were preserved because the trial court addressed the subject matter on which her arguments are based in its preliminary findings of fact and partial decree of divorce and in the court's subsequent findings of fact and conclusions of law. This is essentially the same preservation argument she made with regard to her constitutional claims discussed above, and it fails for the same reason. While the court's own findings and orders indicate that the court considered the components of an alimony determination, they do not demonstrate that the court considered the particular arguments Heidi now makes on appeal or that Heidi provided the court with an adequate opportunity to correct the errors she now asserts. *See Dickman Family Props., Inc. v. White*, 2013 UT App 116, ¶¶ 9, 12–13, 302 P.3d 833. Thus, we conclude that her specific arguments regarding the court's alimony determinations have not been preserved for appeal, *see id.*, and we review them for plain error.

¶39    "To prevail on a claim of plain error, the appellant must show obvious, prejudicial error." *State v. Hare*, 2015 UT App 179, ¶ 9, 355 P.3d 1071. We conclude that the court's equalization analysis constituted plain error and remand for further proceedings. And because the issues Heidi raises about income imputation and child care may arise again in the course of the court's reconsideration of its alimony award on remand, we briefly address them as well.

A.    Income Equalization

¶40    Heidi argues that the court failed to properly equalize the parties' incomes in the course of its alimony determination. In particular, she contends that the court "assigned almost all of the shortfall" in income to her. She also argues that the trial court erred by using her gross income to calculate her unmet needs while using John's net income to determine his ability to pay and that the court erred by failing to equally divide the tax consequences of her alimony award between the parties.

¶41    "Trial courts have considerable discretion in determining alimony . . . and [determinations of alimony] will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Jensen v. Jensen*, 2008 UT App 392, ¶ 5, 197 P.3d 117 (alteration and omission in original) (citation and internal quotation marks omitted). Alimony determinations require a trial court to consider three factors relevant here: "(i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income; [and] (iii) the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(8)(a)(i)-(iii) (LexisNexis 2013); *see also Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 8, 80 P.3d 153.

¶42    In considering an alimony award, "the court should first assess the needs of the parties, in light of their marital standard of living." *Dobson v. Dobson*, 2012 UT App 373, ¶ 22, 294 P.3d 591. If the court finds that the recipient spouse—here, Heidi—is

"able to meet her own needs with her own income based upon the expenses she reasonably incurred, . . . then it should not award alimony." *Id.* However, if the court finds that the recipient spouse is not able to meet her own needs, "then it [should] assess whether [the payor spouse's] income, after meeting his needs, is sufficient to make up some or all of the shortfall between [the recipient spouse's] needs and income." *Id.* If the parties' combined resources are insufficient to meet both parties' needs, the court should "equalize the incomes of the parties." *See id.* (citation and internal quotation marks omitted).

¶43 Equalization of income is "better described as equalization of poverty" or, more specifically, as the equalization of "shortfall." *Kidd v. Kidd*, 2014 UT App 26, ¶ 26, 321 P.3d 200 (citation and internal quotation marks omitted). This approach is reserved for use "only in those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs." *Sellers v. Sellers*, 2010 UT App 393, ¶ 3, 246 P.3d 173. "When this situation arises, the trial court must determine how to equitably allocate the burden of insufficient income that occurs when the resources that were sufficient to cover the expenses of a couple must now be stretched to accommodate the needs of two individuals living separately." *Keyes v. Keyes*, 2015 UT App 114, ¶ 39, 351 P.3d 90. Because both the propriety of and the calculations necessary for equalization are tied to findings regarding the parties' respective needs and income, a court must conduct an adequate needs analysis to properly equalize shortfall. *See Dobson*, 2012 UT App 373, ¶ 21; *Batty v. Batty*, 2006 UT App 506, ¶¶ 4–6, 153 P.3d 827 (explaining that it is improper for the court to award alimony "as simply an income equalization concept" without going through the required needs analysis (internal quotation marks omitted)). And we have also concluded that a court exceeds its discretion by inequitably dividing the shortfall between the parties. *See Keyes*, 2015 UT App 114, ¶¶ 38–42 (concluding that the court

abused its discretion in its equalization analysis when its award to the wife left the husband "with essentially no income for basic necessities"). This is because "[t]he purpose of equalization is to ensure that when the parties are unable to maintain the standard of living to which they were accustomed during marriage, the shortfall is equitably shared." *Kidd*, 2014 UT App 26, ¶ 26.

¶44 In this regard, we have observed that "[e]xact mathematical equality of income is not required, but sufficient parity to allow both parties to be on equal footing financially as of the time of the divorce is required." *Howell v. Howell*, 806 P.2d 1209, 1213 n.3 (Utah Ct. App. 1991). This principle recognizes that, under circumstances where one spouse's legitimate needs exceed the other spouse's, an unequal division of available income may still result in an equitable sharing of the shortfall. *See, e.g.*, *Kidd*, 2014 UT App 26, ¶¶ 25–26 (affirming a shortfall equalization where the receiving spouse shouldered a heavier financial shortfall in circumstances where the payor spouse had to exert "extra effort" to attain his income because he had to commute and work in a remote location and had higher monthly expenses as a result, including approximately $900 a month for transportation and rent related to his work); *cf. Hansen v. Hansen*, 2014 UT App 96, ¶¶ 3–4, 13, 325 P.3d 864 (affirming an equalization analysis that left both parties with an equal monthly shortfall of $521).

¶45 We conclude that the trial court in this case plainly erred by equalizing monthly *income* between the parties even though it had determined that Heidi's reasonable *needs* were significantly greater than John's, thus burdening her with an inequitable portion of the shortfall between the parties' resources and the expenses of maintaining separate households. We also conclude that the court plainly erred by using Heidi's gross income to calculate her needs while using John's net income to assess his ability to provide support. And because the court will be required to reassess its overall alimony determinations, the court

may reconsider on remand whether to equitably allocate the tax consequences of the alimony award between the parties.

1.     Failure to Equalize the Parties' Income Shortfall

¶46     The trial court made findings related to the three basic alimony factors. The court imputed gross monthly income to Heidi of $2,846 but did not determine what her net monthly income would likely be with that level of gross pay. It found that her demonstrated monthly expenses were $14,758, which included child-related expenses. And after deducting Heidi's imputed gross monthly income and the $3,613 it had awarded for child support, the court determined that she was left with an unmet monthly need of "roughly $8,300."

¶47     The court found that John's gross monthly income was $26,667 but then went on to reduce that figure by taxes and other deductions to arrive at a net monthly income of $19,733. After deducting John's $3,613 child support obligation from his net monthly income, the court determined that John was left with $16,120 to meet his monthly expenses. The court then found that John's demonstrated expenses were $10,000 per month and that he was therefore left with a monthly surplus of $6,120 to help support Heidi, which was "ultimately insufficient to satisfy Heidi's unmet need" of $8,300. As a result, the court's analysis demonstrated that the parties' combined resources were insufficient to meet their needs, thus requiring the court "to ensure that . . . the shortfall is equitably shared." *Kidd*, 2014 UT App 26, ¶ 26.

¶48     Rather than use its own findings to equalize the shortfall, however, the court instead turned to schedules and calculations offered by John's alimony expert. John's expert had prepared schedules for both parties, with separate calculations for Utah and Virginia. The schedules used the court's income determinations for both parties and accounted for tax consequences for each, but they did not appear to incorporate

the court's findings of either parties' needs. Rather, the expert's calculations claimed to be based upon the assumption that John and Heidi would equally share custody of the children and reside in the same state and that, as a result, the parties would each incur the same expenses in order to maintain equivalent standards of living. In other words, the expert appears to have assumed that the parties' living expenses would be equal, and his calculations proposed to equalize the parties' standards of living by equalizing their income. The expert's schedules thus represented that awarding Heidi a total support payment—child support and alimony—of roughly $10,000 per month would give both parties a net monthly income of about $10,240, which the expert asserted would allow both parties to maintain equivalent standards of living.

¶49 The trial court adopted the expert's Virginia schedule and, based on the expert's calculations, decided that the schedule's recommendation of a $10,000 total support award would accomplish the task of equitably equalizing the parties' net monthly incomes. The court then calculated John's alimony obligation by deducting the monthly child support payment it had previously ordered him to pay—$3,613—from the $10,000 overall support obligation, arriving at a figure of $6,387, which it rounded up to a $6,400 alimony award to be paid monthly by John to Heidi. The court stated that this would provide both parties with an "essentially identical" "after tax cash flow" and "would leave both parties with an essentially identical shortfall in the amounts needed to meet their monthly needs."

¶50 Heidi contends, in essence, that the court plainly erred when it determined that the recommendations of John's expert equalized the shortfall between the parties. We agree. Even under the higher burden of persuasion attendant to a plain error review, we conclude that the error should have been obvious based on the court's own findings that the parties had materially disparate needs, and that it was prejudicial because it resulted in a facially inequitable alimony award.

¶51    Before the court turned to the report of John's alimony expert, it had determined that there was an approximately $2,180 shortfall in the combined income available to meet Heidi's needs (John's available $6,120 subtracted from Heidi's $8,300 unmet need). And the court apparently concluded that the calculations of John's expert resolved the shortfall equitably. But nowhere in the report do we see any reference to the needs determinations that the court made for each party after trial. In other words, the expert report does not appear to have analyzed alimony in terms of the parties' needs using the actual needs the court ultimately determined. Instead, the expert stated that his recommended support award for Heidi was based upon the assumption that the parties would share custody equally and would incur equal expenses to support themselves and their children, a conclusion that appears to be significantly different from the court's own determination. The expert did not attempt to equitably equalize the parties' shortfall in light of their disparate needs. Thus, by resting its decision on the expert's recommendation of a total support award in the amount of $10,000, the court seemed to arrive at an alimony award that failed to equalize the parties' combined shortfall in available income in light of the court's own differential needs analysis. *See Jensen v. Jensen*, 2008 UT App 392, ¶ 13, 197 P.3d 117 (explaining that it is improper to equalize parties' incomes without the traditional needs analysis).

¶52    In this regard, Heidi's contention—that the court's reliance on the expert's calculations left her with the burden of nearly all of the shortfall—has merit. Before adopting the expert's calculations, the court determined that Heidi had an unmet need of $8,300, after deducting her imputed income and child support. The court then concluded that John had $16,120 available to cover his expenses and to support Heidi after child support and taxes and ultimately determined that John had $6,120 left for Heidi's support. The court's $6,400 alimony award thus left Heidi with a $1,900 monthly shortfall ($6,400 subtracted

from her demonstrated unmet need of $8,300). In contrast, this award left John with only a $280 monthly shortfall (the $6,400 award subtracted from the $6,120 he had available to pay). Put another way, between the court's alimony award, child support, and imputed income ($6,400 plus $3,613 plus $2,846), Heidi appears to have been left with $12,859 in income to meet $14,758 of expenses. In contrast, the court's alimony and child support awards appear to have left John with $9,720 in income ($19,733 in income minus combined support of $10,013) to meet his monthly needs of $10,000. Thus, because the court had already determined that the expenses of each party were reasonable, its decision to equalize *income* rather than *shortfall*—even though Heidi's needs were greater than John's—appears to have left Heidi to bear significantly more of the burden of insufficient resources than John.

¶53 Granted, it is nearly impossible for us to reconcile the components of the court's needs analysis with the assumptions that the expert relied on to reach the conclusions in the report on which the court relied. As a result, we may have misunderstood key underpinnings of the court's ultimate alimony determination based on that report. But absent further explanation by the court to reconcile the apparent analytical disparities between the court's own needs determinations and the expert's calculations, the trial court's alimony award appears to be facially inequitable. *See Keyes v. Keyes*, 2015 UT App 114, ¶ 39, 351 P.3d 90 (explaining that "the burden of insufficient income" must be "equitably allocate[d]" between the parties for purposes of equalization); *see also Roberts v. Roberts*, 2014 UT App 211, ¶ 22, 335 P.3d 378 (vacating and remanding the district court's alimony award where the findings were inadequate to address and resolve the issues raised regarding alimony). And this inequity seems obvious, based on the contrast between the court's own determination that the parties had significantly differing needs and the expert's assumption of equal living expenses for both.

¶54 Accordingly, we must vacate the alimony award and remand for further consideration or, in the alternative, for the court to more adequately justify it based on the evidence at trial.

2. The Failure to Consider Both Parties' Tax Consequences

¶55 Heidi also argues that the court plainly erred by imputing gross income to her for purposes of its needs analysis but calculating John's income available for support based on his net income. We agree.

¶56 It is well settled that alimony awards should be equitable. *See* Utah Code Ann. § 30-3-5(8)(e) (LexisNexis 2013) (explaining that courts are required to "consider all relevant facts and equitable principles" in making alimony awards); *Jones v. Jones*, 700 P.2d 1072, 1074 (Utah 1985) (explaining that "the trial court may make such orders concerning property distribution and alimony as are equitable"). Heidi is correct that the court imputed gross income to her in determining her ability to support herself, while using John's net income to determine his ability to provide support to her. In its preliminary findings and conclusions, the court imputed to Heidi a gross yearly income of $34,150, based upon the vocational expert's report. The vocational expert did not adjust her estimated income for resulting taxes; the expert simply noted that as a public relations specialist, Heidi could earn $34,150 yearly or $2,845.83 monthly. The court imported this preliminary imputation determination into its final findings and conclusions, noting that it had previously ruled that "Heidi is capable of earning $2,846.00 per month," and imputing that amount to her. The court did not determine what her net monthly income would be, and it used the gross monthly income to ultimately calculate her unmet needs.

¶57 By contrast, the court distinguished between John's gross and net income. In particular, it found that while John's monthly gross income was $26,667, his net monthly income was $19,733.

In doing so, the court noted that neither party provided it with "an effective tax rate or with after tax income of the parties," but by averaging John and Heidi's effective tax rate based on several years of the parties' tax returns, the court applied "an effective tax rate of 26%" to John's income, something it did not do with Heidi's. The court then used John's net income to calculate his ability to support Heidi.

¶58    To be sure, we recognize that the trial court ultimately relied upon John's alimony expert's calculations in determining alimony, and the expert's calculations did appear to account for income taxes for both parties. As a result, based upon what the court purported to do below, the ultimate alimony determination did account for income tax consequences for Heidi as well as John. But, as we have explained, it does not appear that the expert's ultimate alimony recommendation accounted for the disparate needs findings that the court actually made, and we have been unable on appeal to reconcile the court's reliance on the expert's calculations with the court's actual needs findings.

¶59    Thus, as it stands, and because the court will be required to re-evaluate the alimony determination and its reliance upon John's alimony expert's calculations on remand, it seems obvious from the court's own findings that it calculated Heidi's needs based on her gross monthly income and John's ability to support her based on his net monthly income. It would be inequitable to calculate the parties' respective incomes in this way, should the court decide to use its own income calculations on remand, because it would result in Heidi's ability to support herself being unrealistically overvalued and, as a consequence, her unmet needs being understated in comparison to John's ability to provide support. Thus, if the court assesses John's ability to meet Heidi's needs on a net basis, it should ensure that Heidi's ability to meet her own needs is also assessed on a net basis. *Cf. McPherson v. McPherson*, 2011 UT App 382, ¶¶ 13, 15–16, 265 P.3d 839 (explaining that "[a] sufficiently detailed finding

regarding . . . the payor spouse's ability to pay . . . includes consideration of the payor spouse's tax obligations," and concluding that the court had exceeded its discretion in part by calculating the husband's alimony obligation using his gross, not net, income).

3.    The Failure to Consider the Tax Consequences of the Alimony Award

¶60    Heidi also argues that the trial court plainly erred by failing to equitably divide the tax consequences of its alimony award between the parties. She contends that, because she will be taxed on her alimony award while John can deduct it from his gross income in calculating his taxable income, the tax effect of the award should be allocated equitably between them. For example, she argues that the court should have determined the taxes Heidi will pay on the alimony award, divided that amount in two, and required each party to bear exactly half of this burden. This would further increase her alimony award and decrease her shortfall, but it would certainly increase John's shortfall, as well.

¶61    On remand, the trial court must revisit the alimony award and may consider allocating the tax burden of the alimony award between the parties, should it determine that it is appropriate to do so in the interests of equity. In making this observation, we note that, contrary to what Heidi appears to argue, an equitable alimony award does not necessarily mean that the parties must share burdens in exact mathematical equality. *See Howell v. Howell*, 806 P.2d 1209, 1213 n.3 (Utah Ct. App. 1991) (explaining that "[e]xact mathematical equality of income is not required, but sufficient parity to allow both parties to be on equal footing financially as of the time of the divorce is required"). Rather, in awarding alimony, the court must "consider all relevant facts and equitable principles." *See* Utah Code Ann. § 30-3-5(8)(e) (LexisNexis 2013). And in no case may the trial court award Heidi more alimony than her demonstrated

need. *Bingham v. Bingham*, 872 P.2d 1065, 1068 (Utah Ct. App. 1994) (explaining that the recipient spouse's demonstrated needs "constitute the maximum permissible alimony award").

B. Imputation of Income to Heidi

¶62 Next, Heidi argues that the court plainly erred by "fail[ing] to adhere to the required imputation analysis set forth" in Utah Code section 78B-12-203(7). *See* Utah Code § 78B-12-203(7) (LexisNexis 2012).[5] She also contends that the court failed to take into account child care needs as required by section 78B-12-203(7)(d). In this regard, she asserts that "[b]ecause the court failed to enter adequate findings, and because the vocational expert's report is significantly lacking, the court was authorized . . . to impute to Heidi only the federal minimum wage." As we have noted, Heidi did not bring her arguments related to income imputation and child care needs to the attention of the trial court, and therefore, they were not preserved below. She requests that we address these issues under the plain error doctrine, contending that the error was obvious because "the trial court failed to adhere to the statutory scheme plainly set forth" in section 78B-12-203(7) and that the error was harmful because the court imputed too much income to her. We conclude that the court did not plainly err.

¶63 In determining an alimony award, the trial court is required to consider the recipient spouse's "earning capacity or ability to produce income." Utah Code Ann. § 30-3-5(8)(a)(ii) (LexisNexis 2013). A trial court "may impute income to an underemployed spouse." *Fish v. Fish*, 2010 UT App 292, ¶ 14, 242 P.3d 787 (citation and internal quotation marks omitted). Any income imputation must "be based upon employment potential

---

5. Utah Code section 78B-12-203 was recently amended, with the amendment to take effect in May 2017. We cite the provisions in effect at the time of the trial.

and probable earnings as derived from employment opportunities, work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds in the community." Utah Code Ann. § 78B-12-203(7)(b). "If a parent has no recent work history[,] . . . income shall be imputed at least at the federal minimum wage for a 40-hour work week," and if greater income is imputed, "the judge . . . shall enter specific findings of fact as to the evidentiary basis for the imputation." *Id.* § 78B-12-203(7)(c). Nonetheless, income may not be imputed if "the reasonable costs of child care for the parents' minor children approach or equal the amount of income the custodial parent can earn." *Id.* § 78B-12-203(7)(d)(i). We conclude that Heidi has not demonstrated that the trial court plainly erred in its findings or by adopting the vocational expert's report and testimony to support its decision to impute income.

¶64   Heidi argues that the trial court's findings supporting its decision to impute income are inadequate. She also argues that the court's findings cannot be "inferred from the vocational expert's report or testimony," because the vocational expert's analysis "does not account for the fact that Heidi lacks the skills to obtain employment without spending time and money to update those skills"; does not address Heidi's concerns regarding other barriers to employment; and "says nothing about [Heidi's] employability in Virginia." Finally, Heidi claims that neither the expert nor the court considered the cost of child care in relation to her earning capacity or any special needs of her children as the imputation statute requires.

1.   The Court's Imputation Findings and the Vocational Expert's Report

¶65   Heidi is correct that the trial court's own findings in support of its imputation determination were not exhaustive: "Based on the testimony of the vocational expert, . . . and the parties, the Court determined that the income of $34,150 per year should be attributed to [Heidi]." And according to the

imputation statute, because it was undisputed that Heidi had "no recent work history," the court was required to "enter specific findings of fact as to the evidentiary basis" to justify imputing more than federal minimum wage. *See* Utah Code Ann. § 78B-12-203(7)(c). However, we may affirm if we can infer the necessary findings from the vocational expert's report and testimony. *See Rayner v. Rayner*, 2013 UT App 269, ¶ 11, 316 P.3d 455 (explaining that we may affirm "the trial court's decision to impute income, absent outright expression of the statutorily mandated finding, if the absent findings can reasonably be implied" by the evidence (citation and internal quotation marks omitted)). And here, the expert's report addresses all of the factors required by section 78B-12-203(7)(b), which states that income imputation "shall be based upon employment potential and probable earnings as derived from employment opportunities, work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds in the community."

¶66    The report addressed Heidi's "potential and probable earnings" based on employment possibilities the vocational expert identified as within Heidi's capabilities, concluding that among the best options were public relations specialist, market research analyst, and general sales representative. The expert included comparisons of the entry-level salary and earnings potential for each of the options. She noted that Heidi had bachelor's degrees in History and Russian with a minor in Soviet Studies, and that she had worked as a Russian translator from 1990 to 1997. While the expert concluded that Heidi's skills as a Russian translator were likely not "transferable at present due to the length of time since she has used the Russian language," she also noted that Heidi's occupational qualifications nevertheless included her college education and degrees, as well as some computer skills. The expert accordingly recommended entry-level positions that would capitalize on her degrees as well as allow her to gain experience in another field. In this regard, the

report indicated that a bachelor's degree was required for two of the three recommended positions—entry-level public relations specialist and market research analyst.

¶67 The vocational expert's testimony at trial corroborated the information she included in her report. She testified that, based on Heidi's education and the results of vocational testing, she "thought that some of the best options for [Heidi] would be public relations specialist, also market research analyst, and then a general sales representative." And she testified about the starting salary for each of the three options as well as a salary Heidi could attain if she maximized her earning potential—for the public relations specialist the entry-level salary was $34,150 yearly, or approximately $2,846 per month.

¶68 Contrary to Heidi's claims, the expert's analysis does address barriers to Heidi's employment. For example, the expert addressed "the fact that Heidi lacks the skills to obtain employment without spending time and money to update those skills." The expert testified that Heidi would need to "update her skills in some areas to qualify for these positions," such as computer skills, but she considered those challenges to be relatively "small things," requiring, for example, about three months of training for a maximum cost of $300 to $400 to update Heidi's computer skills.

¶69 The expert also "address[ed] Heidi's concerns regarding other barriers to employment." The report listed Heidi's perceived barriers, including her mandatory volunteer commitments at her children's schools, child care needs, the jobs she could qualify for not offering her enough money, re-entering the work force after a lengthy employment gap, the added stress of being a working mother, and being able to pursue more education. The expert acknowledged during trial that these were barriers that Heidi might "face getting back into the workforce." In addition, the report mentioned other employability deficits the expert considered applicable, such as Heidi's lack of up-to-

date computer skills, recent work experience, and a return-to-work plan. Because all of these concerns about Heidi's employability were included in the report and in the expert's testimony, it cannot be obvious that the expert failed to address them or that the trial court failed to take them into account in making its imputation determination and ultimately accepting the evaluator's recommendations. *See Rayner*, 2013 UT App 269, ¶ 11.

¶70 Further, Heidi has pointed to no evidence presented to the trial court that would have elevated her particular employability concerns above those normally experienced by other working parents. Indeed, as to child care, the only evidence she points to on appeal is her testimony that she would have to find surrogate care to "have the kids taken care of" while she worked. *Cf. id.* (explaining that missing findings may be harmless where "the undisputed evidence clearly establishes the factor or factors on which findings are missing" (citation and internal quotation marks omitted)). And she does not identify any other evidence presented at trial that might have undermined the significance of her college degrees in the vocational expert's and the court's determination that she would be qualified for entry-level positions with starting salaries higher than the federal minimum wage. *Cf. id.* It cannot be plain error for a trial court to rely on the conclusions and recommendations in a vocational expert's report and testimony to impute income when the report and testimony address the required factors in Utah Code section 78B-12-203 and the party challenging the determination presented limited or no evidence to refute the relevant areas of the expert's assessment.

¶71 Finally, while Heidi is correct that the report does not address her employability in Virginia, the vocational expert testified that she considered only Utah employability because Heidi "had indicated that she'd planned to stay [in Utah]." As the trial court also noted, before trial Heidi "maintained that under no circumstances would she move back to Virginia" and

she did not retract that position until the second day of trial. We cannot fault either the expert or the court for failing to consider employability in Virginia under the circumstances. *Cf. State v. Winfield*, 2006 UT 4, ¶ 15, 128 P.3d 1171 (explaining that, under the invited error doctrine, appellate review of an issue is precluded because "a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error" (citation and internal quotation marks omitted)).

2.      The Statutory Exceptions to Income Imputation

¶72     Heidi also argues that the court plainly erred by "overlook[ing] the question of child care" contrary to the requirement of Utah Code section 78B-12-203(7)(d). She contends that the trial court ought to have factored in the cost of child care in Virginia to determine whether that amount "approach[ed] or equal[ed] the amount of income [she] could earn." *See* Utah Code Ann. § 78B-12-203(7)(d)(i) (LexisNexis 2012). She also argues that the court ought to have considered whether "unusual emotional or physical needs" of her children "require[d] [her] presence in the home." *See id.* § 78B-12-203(7)(d)(iv). But Heidi has pointed to no evidence presented at trial regarding the costs of child care in either Utah or Virginia. And even if she had, the trial court ordered that "[t]he parties shall share equally any reasonable or work related child care costs" and awarded Heidi child support of roughly $3,600 a month. Thus, to the extent that Heidi might incur child care costs while working, both parties would bear those costs, alleviating some strain on her income. Similarly, she has identified no evidence that her children had unusual needs that would preclude her from working.

¶73     Because income imputation was a significant issue at trial and Heidi has not identified any point during or after trial that she called any imputation exception to the trial court's attention, it would not have been obvious to the trial court that Heidi's

potential child care costs or her children's particular needs implicated statutory exceptions to imputation of income in her case. It cannot be plain error for a court to make no findings about such an issue when it was not raised, and Heidi cannot show prejudice if the trial court was provided no evidence from which it might have made a different decision. *Berkshires, LLC v. Sykes*, 2005 UT App 536, ¶ 21, 127 P.3d 1243 (explaining that an error is prejudicial if, "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant" (citation and internal quotation marks omitted)).

### III. The Trial Court's Attorney Fees Determinations

¶74    Heidi argues that the trial court erred in denying her request for attorney fees and costs related to her discovery efforts involving John's interest in and work with Sun Management. She contends that the court failed to consider the required factors for awarding fees. And she contends that the trial court's reasons for denying fees are otherwise "inconsistent, inequitable, and unsupported by the record." We affirm the trial court's attorney fees determination.

### A.    Failure to Consider the Attorney Fees Factors

¶75    Heidi first argues that the court failed to consider the appropriate factors for awarding attorney fees. Quoting *Ouk v. Ouk*, 2015 UT App 104, 348 P.3d 751, she asserts that although "the decision to award fees and the amount of such fees are within the trial court's discretion," the trial court failed to address the required factors: "evidence of the financial need of the receiving spouse, the ability of the other spouse to pay, and the reasonableness of the requested fees." *See id* ¶ 16 (citations and internal quotation marks omitted). And she contends that the reasons the court did give for its denial of fees are incorrect as a matter of law.

¶76　Below, Heidi requested that the trial court award her all the fees and costs she had incurred in the case and, in the alternative, she asked for an award of the fees related to the Sun Management discovery. Both requests were made under Utah Code section 30-3-3, which provides,

> [I]n any action to establish an order of custody, parent-time, child support, alimony, or division of property in a domestic case, the court may order a party to pay the costs, attorney fees, and witness fees, including expert witness fees, of the other party to enable the other party to prosecute or defend the action.

Utah Code Ann. § 30-3-3(1) (LexisNexis 2013). In determining whether to award fees under this section, the trial court must consider the requesting spouse's financial need, the other spouse's ability to pay, and the reasonableness of the fees. *See Ouk*, 2015 UT App 104, ¶ 16.

¶77　On appeal, Heidi does not challenge the trial court's decision to deny an award of all her fees. Rather, she contends that the court failed to consider the required factors in denying her Sun Management fees request. But by focusing on only the court's findings related to Sun Management, Heidi fails to consider the court's decision in the context of all of its findings related to attorney fees. Our approach to interpretation of judicial orders is similar to the way we interpret contracts. *Iota LLC v. Davco Mgmt. Co.*, 2016 UT App 231, ¶ 33, 391 P.3d 239. "In interpreting a contract, [w]e look to the writing itself to ascertain the parties' intentions, and we consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139 (alteration and omission in original) (citation and internal quotation marks omitted); *see also New York Ave. LLC v. Harrison*, 2016 UT App 240, ¶ 21, 391 P.3d 268 (explaining that we interpret a contract

"as a whole" according to its plain language). Thus, rather than focusing narrowly on the court's denial of Heidi's request for the Sun Management discovery costs and fees, we consider the court's decision in relation to all of the findings and determinations it made as to the parties' requests for attorney fees.

¶78    This approach is especially appropriate here for two reasons. First, Heidi requested an award of fees for the whole case or, in the alternative, for only the Sun Management portion, and she requested both under section 30-3-3(1). And second, the court analyzed her request for Sun Management-related attorney fees in a single order addressing that narrower request within the broader context of its observations on the parties' approach to the whole litigation. Viewed in that light, it is apparent that the court addressed the required factors in denying Heidi her fees and costs.

¶79    In its final findings of fact and conclusions of law, the court found,

> At the beginning of this case, the parties had roughly $1.8 million in liquid assets available to them jointly, and this fund was used to pay both parties' attorneys' fees and costs. Because these joint funds were available to and were used by the parties to fund the litigation, the court cannot conclude that either party is in greater need of funds for the litigation or that either party lacked sufficient resources to pay for attorneys' fees and costs.

¶80    The court also noted that the total attorney fees in the case amounted to approximately $1.2 million—in other words, that the fees spent had not yet exceeded the assets available for fees. But it noted that nevertheless "substantially all of the assets available for division among the parties have been spent by

them on attorneys' fees and costs—which, of course, the parties are perfectly free to do."

¶81 The trial court also made findings regarding the reasonableness of the fees the parties had incurred in the case as a whole. The court found that "the custody issues in this case [were] unusually complex and contentious" and "warranted an unusual amount of attorney and expert costs." However, the court noted that "the majority of the money spent in this case was on matters unrelated to the custody determination." Instead, it found that "[b]oth parties have litigated essentially every issue in this case aggressively and unreasonably." And it found that "both parties have caused the fees and costs in this case to skyrocket out of control." Focusing specifically on Heidi's approach to the litigation, the court noted that she "chose to employ numerous different lawyers and law firms to represent her in the course of this case, filed numerous unnecessary motions, resisted what should have been simple issues to resolve, and sought several continuances, all of which drove up the cost." And it concluded that "both parties made a conscious, fully-informed decision to devote to this legal battle the vast majority of the financial resources available to this estate." Based on this reasoning, the court determined that awarding Heidi all her fees would be "manifestly unjust," a determination she does not challenge on appeal.

¶82 With respect to the Sun Management fees in particular, the court denied Heidi's request "for at least the following reasons": (i) the Sun Management discovery fees and costs were "offset by fees and costs she forced John to incur as a result of her own litigation tactics"; (ii) "John's brother, not John, is responsible for unnecessarily driving up" the discovery costs, though the court noted that it believed "John played a considerable role in this"; and (iii) Heidi "failed to comply with the court's May 28, 2014, Minute Entry" setting out the requirements for submission of fee requests.

¶83    When viewed as a whole, the court's findings clearly address the statutory factors. The court found that Heidi had no need for assistance because funds for litigation expenses remained available in the marital estate, and that due to the unreasonable litigation tactics of *both* parties, the fees incurred had "skyrocket[ed] out of control." Indeed, the court found that both parties had "litigated essentially every issue" in the case unreasonably, a statement broad enough to encompass the issues related to Sun Management discovery. Heidi fails to deal with or challenge these findings in her opening brief.[6] *Cf. Duchesne Land, LC v. Division of Consumer Prot.*, 2011 UT App 153, ¶ 8, 257 P.3d 441 (explaining that an appellant must address the basis of the district court's decision to persuade a reviewing court that the district court has erred).

¶84    Further, the court's specific findings related to the Sun Management fees necessarily incorporate the court's overall findings regarding the needs and financial resources of the parties and the reasonableness of the fees that have been incurred. *See WebBank v. American Gen. Annuity Service Corp.*,

---

6. For the first time in her reply brief, Heidi seems to acknowledge that the court's finding regarding the availability of litigation funds from the $1.8 million in the marital estate addressed the "need" factor, and in doing so, she contends that this finding is not sufficient to resolve the issue of Heidi's need or John's ability to pay, particularly in light of the parties' relative earning potentials and the harsher effect of the marital estate's dissipation on Heidi. However, this is essentially an attack on the correctness of the court's overall need finding, and one that Heidi did not attempt to make in her opening brief. Thus, because she raises this argument for the first time in her reply brief, we decline to address it. "[W]e do not consider arguments raised for the first time in an appellant's reply brief." *Mower v. Simpson*, 2012 UT App 149, ¶ 39, 278 P.3d 1076.

2002 UT 88, ¶ 18, 54 P.3d 1139. Indeed, the court's finding that the fees Heidi incurred through discovery are offset by fees and costs she forced John to incur flows directly from its overarching conclusion that both parties had unreasonably increased the costs of litigation in the case and that each had made "a conscious, fully-informed decision to devote to this legal battle the vast majority of the financial resources available."[7] We cannot fault the court for declining to award Heidi her requested fees after it had determined that she not only did not need an award of fees to "enable [her] to prosecute" the issues related to Sun Management, *see* Utah Code Ann. § 30-3-3(1) (LexisNexis 2013), but also that her request was unreasonable in light of her overall strategy of "aggressively and unreasonably" litigating "every issue," *see Dahl v. Dahl*, 2015 UT 79, ¶¶ 176, 177–79 (concluding that the appellant's fee request was unreasonable where the "litigation strategy . . . was inefficient, ineffective, and unjustifiably costly"). *See also Osguthorpe v. Osguthorpe*, 804 P.2d 530, 537 (Utah Ct. App. 1990) (per curiam) ("Before a court will award attorney fees, the trial court must find the requesting party is in need of financial assistance and that the fees requested are reasonable.").

B.      The Denial of Attorney Fees on Other Grounds

¶85    Heidi also claims that, even if the court did address the statutory factors, the court's denial of Sun Management fees was otherwise "inconsistent, inequitable, and unsupported by the record." For example, she points out that although the court

---

7. To the extent Heidi argues that the court's assessment of the attorney fee factors is not supported by the record, Heidi's entire challenge on this point is one sentence: "Moreover, the court's decision is incorrect as a matter of fact because its decision does not comport with the record." This is insufficient to persuade us that the court's factual findings are clearly erroneous, and we decline to address this contention further.

found that Heidi's own litigation tactics offset the fees she incurred related to the Sun Management discovery, John's brother testified that Sun Management paid its own fees, which she asserts allowed Sun Management "to drive up litigation at Heidi's expense," without John himself incurring any "corresponding expense." She contends that, as a matter of equity, the court should have required John to bear half of the Sun Management fees personally rather than "requiring Heidi to bear her share of attorney fees while John shares his attorney fees with his company." She also contests the trial court's alleged finding that she drove up the costs related to the custody litigation, contending that John was to blame for driving up those costs.

¶86    But a court making its attorney fees determination in a divorce case under section 30-3-3(1) is not required to "equalize the pain in attorney fees and punish both parties equally for unnecessarily aggravating the litigation." Attorney fees under section 30-3-3 are not punitive in nature or awarded to equalize the "pain" of the litigation between the parties. *Cf. Roberts v. Roberts*, 2014 UT App 211, ¶ 47, 335 P.3d 378 (explaining that "the purpose of divorce proceedings should not be to impose punishment on either party" (citation and internal quotation marks omitted)). Rather, they are awarded based on a court's assessment of the circumstances surrounding the receiving party's need for the fees to "prosecute or defend" the case. *See* Utah Code Ann. § 30-3-3(1); *Connell v. Connell*, 2010 UT App 139, ¶ 29, 233 P.3d 836 (explaining that, under section 30-3-3(1), "the moving spouse's need is a sine qua non" of the award); *Ostermiller v. Ostermiller*, 2008 UT App 249, ¶ 7, 190 P.3d 13 (explaining that "so long as [the wife] has sufficient resources to meet her needs [for attorney fees], [the husband] need not pay [the wife's] attorney fees, even if he has more money at his disposal with which to pay his own fees and will have more money to spare than will [the wife]"), *aff'd in part, rev'd in part on other grounds*, 2010 UT 43, 233 P.3d 489. As a result, for purposes

of section 30-3-3(1), whether Sun Management instead of John paid the discovery fees is not relevant to the court's assessment of whether Heidi needed an award of fees to enable her to pursue discovery of Sun Management.

¶87    Further, Heidi's contention regarding the court's view of her role in the custody litigation is misplaced. The court made no finding that suggested Heidi was primarily responsible for driving up the fees related to custody of the parties' children. Instead, it found that Heidi had been responsible "for at least half—if not more—of the excessive fees and costs that have been incurred" throughout the entire case, and that although the custody issues in the case were "unusually complex and contentious," "the majority of the money spent in this case *was on matters unrelated to the custody determination*." (Emphasis added.) Thus, to the extent that Heidi is challenging the court's characterization of her role specifically in relation to the custody fees as a way to argue that the court's decision was incorrect, we see no support for her contention in the court's attorney fees decision.

¶88    Accordingly, we are not persuaded that the court exceeded its discretion when it denied Heidi her request for fees related to Sun Management discovery.[8] Contrary to Heidi's assertions, the court did consider the required factors, and we do not agree that the court's decision otherwise exceeded its broad discretion. As a result, we also deny Heidi's request for attorney fees on appeal. *See Tobler v. Tobler*, 2014 UT App 239, ¶ 48, 337

---

8. Heidi also argues that the trial court erred by concluding that she waived her entitlement to attorney fees related to Sun Management by failing to comply with the procedure set out in its Minute Entry. However, because we conclude that the court's denial of her fee request was within its discretion and supported by its findings, we do not reach the issue of whether the court incorrectly determined she had waived her fee claim.

P.3d 296 (explaining the general rule that "we award appellate attorney fees and costs when a party was awarded fees and costs below and then prevails on appeal" and declining to award the wife the attorney fees incurred for her successful appeal because the "district court expressly ordered both parties to bear their own attorney fees and costs").

CONCLUSION

¶89   Heidi appealed the court's decisions in this case in three areas, contending that the court erred in requiring that she reside in Virginia within twenty-five miles of John; that various of its alimony determinations were improper; and that she should have been awarded partial attorney fees and costs below.

¶90   We conclude that the court did not err in establishing the proximity requirement. Regarding alimony, we conclude that the court did not err by imputing income to Heidi based upon the vocational expert's report. However, we have decided that the court may have erred by relying upon John's alimony expert's calculations in the way it did. In the alternative, we have determined the court's explanation of its equalization decision to be inadequate to support a conclusion on appeal that it was equitable. We also conclude that the court erred by using Heidi's gross income to calculate her needs while using John's net income to determine his ability to pay. On remand, the court may also consider, in its discretion, whether to allocate the tax consequences of its alimony award as a matter of equity. Finally, we conclude that the court did not err in declining to award Heidi partial attorney fees and costs.

¶91   Accordingly, we remand the case to the trial court for further proceedings consistent with our decision.

_____