**2023 UT App 20**

## THE UTAH COURT OF APPEALS

AMY R. MYERS,
Appellee,
*v.*
JACOB W. MYERS,
Appellant.

Opinion
No. 20220002-CA
Filed March 2, 2023

Sixth District Court, Richfield Department
The Honorable Brody L. Keisel
No. 184600056

Benjamin L. Wilson, Attorney for Appellant

Douglas L. Neeley, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

HARRIS, Judge:

¶1      After more than two decades of marriage, Jacob and Amy Myers divorced in 2018, and mutually agreed to the terms of their divorce. In particular, they agreed that Jacob[1] would pay Amy $916 per month in child support and $2,300 per month in alimony. Less than two years later, Jacob filed a petition to modify the divorce decree, asserting that both his and Amy's income had changed since the divorce. The district court, after holding a trial, denied Jacob's petition to modify, and Jacob appeals that denial,

---

1. Because the parties have the same last name, we refer to them by their first names for clarity, with no disrespect intended by the apparent informality.

asserting that the court erred in determining that Amy's ability to earn had not changed and in failing to make findings regarding Amy's reasonable expenses. We find merit in Jacob's positions, and therefore reverse and remand.

BACKGROUND

¶2      Jacob and Amy Myers married in 1995, but divorced in 2018 after some twenty-three years of marriage. When they divorced, one of their children (born in 2001) was still a minor, but all their children are now adults. Throughout most of their marriage, Jacob worked in oil production as a rig manager. His position paid relatively well—at the time of the divorce, he was earning $8,233 per month—but required him to work a nontraditional schedule (two weeks on, two weeks off), and in addition the job was sometimes dangerous and often involved the operation of heavy machinery.

¶3      While Jacob worked in the oil fields, the couple decided that Amy would—at least until the children were grown—forgo steady employment outside the home in order to care for the children. Amy did, however, run a small "foot zoning" business from which she earned approximately $250 per month.

¶4      In April 2018, Amy filed for divorce, citing irreconcilable differences. Jacob did not contest Amy's petition; instead, the parties—neither of which were, at the time, represented by counsel—filed a joint stipulation, using forms provided by the court's self-help center, agreeing to resolve all matters related to the divorce petition. As amended, the stipulation provided that Jacob would pay Amy $916 per month in child support—at least for another year or two until the parties' youngest child reached the age of majority—and $2,300 per month in alimony. Jacob's obligation to pay alimony was to last twenty-three years—until April 2041—unless Amy remarried or cohabited before that.

¶5    In the stipulation, the parties agreed that Jacob's income was $8,233 per month, and that Amy's income was $250 per month, and those figures were apparently used to calculate Jacob's child support obligation according to applicable guidelines. But the stipulation contained no indication of how Jacob's alimony obligation was calculated; in particular, the stipulation was silent as to what Amy's reasonable monthly expenses might be.

¶6    Using court-approved forms, the parties incorporated the terms of their stipulation into proposed findings of fact and conclusions of law, as well as a proposed divorce decree, and the district court signed the documents, thus finalizing the parties' divorce, in May 2018. The final documents, like the parties' amended stipulation, provided that Jacob would pay $916 per month in child support and $2,300 per month in alimony, but contained no findings about Amy's reasonable monthly expenses.

¶7    About eighteen months later, in November 2019, Jacob—now represented by an attorney—filed a petition to modify the alimony award contained in the decree. In the petition, Jacob alleged that "the income of both parties has significantly changed since their divorce was finalized." With regard to his own income, Jacob alleged that he was "no longer working in the oil fields" because he was "no longer able to work the same work schedule and the same type of work because of how it was negatively affecting him." He asserted that he was "going back to school" in an effort to begin a different career, and that he was "currently not working." With regard to Amy's income, Jacob alleged that Amy had become employed and earned $1,200 per month, and that her "self-employment income" had increased to $1,500 per month, such that Amy's total monthly income was $2,700. Jacob alleged that the changes in the parties' respective incomes constituted a "substantial change in circumstances that warrants a modification" of the alimony award.

¶8     Just a few weeks later, in January 2020, Amy—also now represented by an attorney—filed a motion for an order to show cause, asserting (among other things) that Jacob had failed to fully comply with his child support and alimony obligations. The court issued an order commanding Jacob to appear and show cause why he should not be held in contempt of court, and later held an evidentiary hearing to consider the matter. At that hearing, the court found that Jacob had "voluntarily quit his employment" in the oil fields and that, "if he hadn't, he would have been able to pay what was ordered." The court thus found Jacob in contempt and ordered him to pay Amy more than $22,000 in back child support and nearly $6,000 in unpaid alimony.

¶9     In the meantime, Jacob's petition to modify remained pending, and the parties exchanged updated financial declarations in anticipation of an eventual trial. Amy's first updated financial declaration, signed in December 2019, listed total annual income of nearly $11,000 (or about $889 per month) from three different sources: a new job, her foot zoning business, and teaching yoga classes. In this same declaration, Amy set forth monthly expenses of $4,084, with some of the expenses being at least partially attributable to her youngest child, who was still living in the home with Amy at that point. Then in August 2021, on the day of trial, Amy submitted a second updated financial declaration. According to this new declaration, Amy had recently obtained a different job, this one full-time, that paid her $45,000 per year ($3,750 per month). In addition, Amy stated that she earned $241 per month from her foot zoning business and $22 per week teaching yoga. She also asserted that her monthly expenses had increased to $4,795 (although the line-items listed in the declaration add to only $4,613), even though no children were living with her any longer. Among the changes from the 2019 declaration were a $500 increase in healthcare expenses, a $175 increase in real estate maintenance, a $100 increase in entertainment expenses, and an $88 increase in utilities.

¶10     In August 2021, the district court held a one-day bench trial to consider Jacob's petition to modify. The only two witnesses to testify were Jacob and Amy. During his testimony, Jacob explained that he voluntarily left his position in the oil fields because he was no longer able to focus on his job duties to the degree he wanted, and he was worried that—due to the dangerous nature of the work—he would injure himself or someone else. However, he acknowledged, on cross-examination, that he was still physically able to perform the duties of the job; that his employer had not asked him to leave; that he had not received mental health counseling to address his concerns about the stress of his work; that he could have taken a leave of absence to address those issues and "gone back to" his job after that; and that if he had done so, he would still "be able to . . . pay the $2,300 a month in alimony." He testified that, as of the time of trial, he was working at a home improvement warehouse earning $14 per hour, or $2,426 each month.

¶11     During her testimony, Amy testified that she had recently obtained full-time employment with the local chamber of commerce, in which she earned a salary of $3,750 per month. In response to direct questioning about this job, Amy conceded that she has "the ability to earn at least $3,750 a month," and that she would be able to "do that moving forward." In addition, she acknowledged that she earned additional income from her foot zoning business and her work as a yoga instructor. Amy testified that she earned some $100 per month from teaching yoga. With regard to her foot zoning business, she testified that she averaged ten treatments per month and charges $50 per treatment, and therefore earns $500 per month in revenue. But she testified that she must pay certain expenses associated with the business that eat up most of the revenue, resulting in her making only some $90 per year (or $7.50 per month) in profit. On cross-examination, she acknowledged that her total gross income from all sources, before expenses, was approximately $4,350 per month.

¶12 Amy testified that she was still living in the same house that the couple had been living in during the marriage, but that now—at the time of trial—she was living there alone because her children were grown and gone. With regard to expenses, she testified that her total monthly expenses were $4,084 in 2019 but had increased to $4,795 at the time of trial, despite the fact that, by the time of trial, she was living alone. She explained that new health insurance and home maintenance costs were largely responsible for the increase. But then, in response to a direct question about how her expenses at the time of the 2018 divorce compared to her expenses at the time of the 2021 modification trial, she testified that her expenses had "stayed the same."

¶13 After trial, the parties (through counsel) submitted written closing arguments. Amy argued that, for purposes of the alimony computation, the court should impute to Jacob the same income he had made in the oil fields, find there to be no material and substantial change in circumstances, and on that basis dismiss the petition to modify. For his part, Jacob argued that the court should modify (or even terminate) his alimony obligation because Amy was now employed full-time and had the ability to provide for her own needs. In particular, Jacob argued that Amy's reasonable expenses were in actuality less than the amounts reflected on her recent financial declaration and in her testimony, and that her increased income was sufficient to meet those needs.

¶14 A few weeks later, the district court issued a written ruling denying Jacob's petition to modify. In its ruling, the court found that Jacob had voluntarily quit his job in the oil fields, and that his monthly income had decreased from $8,233 to $2,427. The court also found that Amy "currently works" for the local chamber of commerce "earning $45,000 annually," and that Amy "also has side businesses doing foot treatments and teaching yoga." But the court made no specific finding regarding Amy's total income.

¶15    Building on these findings, the court concluded that Jacob's change in income constituted "a substantial material change in circumstances that was not expressly stated in the decree." The court did not separately analyze whether the change in *Amy's* income also constituted such a change in circumstances.

¶16    Having concluded that there existed a substantial material change in circumstances, the court proceeded to "consider whether modification [of the alimony award] is appropriate." The court began its analysis by examining Jacob's income situation, and concluded that, because Jacob had left his job voluntarily and had not sustained any loss in earning capacity, Jacob "remains able to earn income at the level he was earning at the oil fields." Accordingly, the court imputed to Jacob an income of $8,233 per month for purposes of the alimony calculation.

¶17    With regard to Amy's expenses, the court found that her "financial needs . . . [have] not changed since" 2018, when "the stipulated decree was entered," but made no specific finding as to the exact amount of those expenses.

¶18    And with respect to Amy's earning capacity, the court offered its view that the "determinative factor[]" was not Amy's income but, instead, her *ability* to provide" for herself. On that score, the court found that "[n]o evidence was presented that [Amy] has obtained extra education or has otherwise increased her *ability* to earn since the time of the divorce," and therefore concluded that—despite her increased income—her earning capacity had not changed. In so ruling, the court observed that it was Jacob's "unilateral decision" to leave his job that compelled Amy to "obtain employment to provide for herself," and stated that reducing Jacob's alimony obligation where the precipitating event "was [Jacob's] decision to leave his employment would set a precedent allowing parties who have stipulated to pay alimony to renege on that stipulation by taking a much lower paying job

and forcing receiving parties to find additional employment by stopping alimony payments."[2]

ISSUE AND STANDARDS OF REVIEW

¶19 Jacob now appeals the court's denial of his petition to modify. In this context, "we review the district court's underlying findings of fact, if any, for clear error," *Peeples v. Peeples*, 2019 UT App 207, ¶ 11, 456 P.3d 1159, and we review its determination regarding the presence or absence of a substantial change of circumstances, as well as its ultimate determination regarding the petition to modify, for an abuse of discretion, *see id.*; *see also Armendariz v. Armendariz*, 2018 UT App 175, ¶ 6, 436 P.3d 294. The district court's choice of, and application of, the appropriate legal standard, however, "presents an issue of law that we review for correctness." *Peeples*, 2019 UT App 207, ¶ 11.

---

2. Amy does not argue that we should affirm the denial of Jacob's petition to modify on the basis that the original award was derived from a stipulation, and therefore the district court's comments about holding Jacob to his stipulation are not directly before this court. But we note, for clarity, that even stipulated alimony awards are subject to modification. *See, e.g.*, *Diener v. Diener*, 2004 UT App 314, ¶ 5, 98 P.3d 1178 (noting that, while a court "is certainly empowered to consider the circumstances surrounding an existing stipulation when considering a petition to modify . . . , the law was intended to give the courts power to disregard the stipulations or agreements of the parties . . . and enter judgment for such alimony . . . as appears reasonable, and to thereafter modify such judgments when change of circumstances justifies it, regardless of attempts of the parties to control the matter by contract" (quotation simplified)); *accord Sill v. Sill*, 2007 UT App 173, ¶¶ 12–18, 164 P.3d 415.

ANALYSIS

¶20    We begin our analysis with a general discussion of petitions to modify alimony awards and the process courts are to follow when adjudicating such petitions. We then address Jacob's claim that the court failed to follow the correct process in this case.

I

¶21    After a district court has made an award of alimony, the court "retains continuing jurisdiction to" modify that award "when it finds that there has been a substantial material change in circumstances." *See Nicholson v. Nicholson*, 2017 UT App 155, ¶ 7, 405 P.3d 749 (quotation simplified); *see also* Utah Code § 30-3-5(8)(i)(i) (2019).[3] If the court determines that no substantial

---

3. At the time Jacob filed his petition to modify, the relevant statute authorized modification of alimony awards when the movant could demonstrate that there had been "a substantial material change in circumstances *not foreseeable at the time of the divorce*." Utah Code § 30-3-5(8)(i)(i) (2019) (emphasis added). In 2021, prior to the trial on Jacob's petition to modify, our legislature amended that statutory provision; under current law, modification is authorized upon a showing that there has been "a substantial material change in circumstances *not expressly stated in the divorce decree or in the findings that the court entered at the time of the divorce decree*." *Id.* § 30-3-5(11)(a) (2022) (emphasis added). In this appeal, the parties have not briefed the question of which version of the statute applies to Jacob's petition to modify, nor has either side suggested that the outcome of this case turns on these differences in statutory text. Operating on the assumption that Jacob is entitled to application of the version of the statute in effect when he filed his petition, *see State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 (stating that "we apply the law as it exists at the time of the event regulated by the law in question," and that when that

(continued…)

material change in circumstances has occurred, then the court's analysis ends, and the petition to modify the alimony award is properly denied. *See Moon v. Moon*, 1999 UT App 12, ¶ 27, 973 P.2d 431 ("As a threshold issue, before modifying an alimony award, the court must find a substantial material change in circumstances . . . ." (quotation simplified)); *see also Peeples v. Peeples*, 2019 UT App 207, ¶ 32, 456 P.3d 1159 (affirming a district court's denial of a petition to modify on the ground that there existed no substantial material change in circumstances).

¶22    If, however, the court finds that a substantial material change in circumstances has occurred, the court must conduct a complete analysis regarding whether the alimony award remains appropriate. *See Nicholson*, 2017 UT App 155, ¶ 7 (stating that, once a finding of changed circumstances "has been made, the court *must* then consider" the alimony factors (emphasis added) (quotation simplified)); *accord Moon*, 1999 UT App 12, ¶ 29. This analysis should include examination of the statutory alimony factors, *see* Utah Code § 30-3-5(8)(a) (2019), including the factors commonly referred to as "the *Jones* factors," *see Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985); *see also Nicholson*, 2017 UT App 155, ¶ 7 (stating that, after finding that circumstances have changed, "the court must then consider at least the following factors in determining a new alimony award: (i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income; (iii) the ability of the payor spouse to provide support; and (iv) the length of the marriage" (quotation simplified)). "These factors apply not only to an initial award of alimony, but also to a redetermination of alimony during a

---

event is a motion, "we apply the law as it exists at the time the motion is filed"), we apply the 2019 version of the statute in this appeal, but follow the parties' lead in presuming this application to have no effect on the outcome of the case.

modification proceeding." *Williamson v. Williamson*, 1999 UT App 219, ¶ 8, 983 P.2d 1103.

¶23 "Consideration of these factors is critical to achieving the purposes of alimony," *Paulsen v. Paulsen*, 2018 UT App 22, ¶ 14, 414 P.3d 1023, which are "(1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge," *Miner v. Miner*, 2021 UT App 77, ¶ 14, 496 P.3d 242 (quotation simplified). "The core function of alimony is therefore economic— it should not operate as a penalty against the payor nor a reward to the recipient." *Roberts v. Roberts*, 2014 UT App 211, ¶ 14, 335 P.3d 378.

¶24 "Regardless of the payor spouse's ability to pay more, the recipient spouse's demonstrated need must constitute the maximum permissible alimony award." *Id.* (quotation simplified); *see also Barrani v. Barrani*, 2014 UT App 204, ¶ 30, 334 P.3d 994 ("An alimony award in excess of the recipient's need is a basis for remand . . . ."). Because a recipient spouse's demonstrated need constitutes an effective "ceiling" on an alimony award, *see Fox v. Fox*, 2022 UT App 88, ¶ 19, 515 P.3d 481, courts often begin their analysis by assessing whether recipient spouses are able to meet their reasonable needs through their own income. *See Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 42, 402 P.3d 219 (stating that, in determining alimony, courts will generally "first assess the needs of the parties, in light of their marital standard of living" (quotation simplified)). If the recipient spouse is able to meet his or her own needs, then the analysis ends, and no award should be made, but if "the recipient spouse is not able to meet [his or] her own needs, then [the court] should assess whether the payor spouse's income, after meeting his [or her] needs, is sufficient to make up some or all of the shortfall between the recipient spouse's needs and income." *See id.* (quotation simplified).

¶25    When considering the relevant alimony factors, courts are "required to make adequate factual findings on all material issues, unless the facts in the record are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 9, 80 P.3d 153 (quotation simplified). When a district court fails to enter specific findings regarding "the needs and condition of the recipient spouse, making effective review of the alimony award impossible, that omission is an abuse of discretion." *Id.* ¶ 10.

II

¶26    With these principles in mind, we turn our attention to Jacob's assertion that the court failed to follow the correct process in adjudicating his petition to modify. In particular, Jacob asserts that the court—once it determined that there had been a substantial material change in circumstances—was required to conduct a complete analysis of all the alimony factors, and that it failed to properly do so.[4] We find merit in Jacob's argument.

---

4. Amy characterizes Jacob's appellate claims as assertions that the district court's findings were inadequate, and argues based on this characterization that Jacob—by not asking the court to make more detailed findings—failed to preserve his claims for appellate review. *See In re K.F.*, 2009 UT 4, ¶ 60, 201 P.3d 985 (stating that a party "waives any argument regarding whether the district court's findings of fact were sufficiently detailed when the [party] fails to challenge the detail, or adequacy, of the findings with the district court" (quotation simplified)). While we acknowledge—as discussed herein—that the court did not make findings on several of the alimony factors, that was due to the court's error (discussed herein) regarding Amy's earning capacity, and its concomitant failure to complete the proper legal analysis. Thus, we disagree with Amy's characterization of Jacob's claims on

(continued…)

¶27 The district court started its analysis in the proper place, and assessed whether Jacob had demonstrated that there had been a substantial material change in circumstances that would justify reopening the alimony inquiry. Looking just at the change in Jacob's own income, the court made a finding that there had been a "substantial change in circumstances." And neither party takes issue with this finding on appeal; both appear to acknowledge the correctness of the court's initial determination that circumstances affecting these parties had changed enough to justify a second look at the alimony situation.[5]

¶28 From there, though, the court's analysis strayed from the proper path. After determining that the change in Jacob's income constituted a substantial material change in circumstances, the court did not conduct a full analysis of the relevant alimony factors. With regard to Amy's needs, the court's analysis, in full, was simply this: "[Amy] testified that her monthly expenses have not increased from the time the parties were divorced in May 2018 until the time of trial in August of 2021." The court made no

---

appeal, and note that Jacob certainly preserved for our review the general question of whether the district court applied the correct legal analysis to his petition to modify, as well as the more specific question of whether Amy can meet her needs through her own income. Thus, we reject Amy's assertion that Jacob's contentions on appeal were not properly preserved for our review.

5. We note that the court made this determination by looking solely at the change in Jacob's income. Arguably, the change in Amy's income would constitute a second basis for a determination that circumstances had changed significantly enough to revisit the appropriateness of the alimony award. Ultimately, however, it does not matter, for purposes of this appeal, which change the district court relied on to determine that a substantial material change had taken place.

finding that Amy's testimony on that point was credible, *see Rehn v. Rehn*, 1999 UT App 41, ¶ 7, 974 P.2d 306 ("A trial court may not merely restate the recipient spouse's testimony regarding her monthly expenses." (quotation simplified)), and did not make any effort to assess what Amy's reasonable monthly needs actually were; the court's comparison to the 2018 divorce decree is especially unhelpful, in context, because that decree contained no specific determination regarding Amy's expenses.

¶29   With regard to the parties' earning capacity, the court acknowledged that Amy had obtained a full-time job that paid her $3,750 each month, and that Amy "earns additional income from a foot zoning business and teaching yoga." But the court made no finding as to what Amy's total income actually was, stating that "[n]o evidence was presented that [Amy] has obtained extra education or has otherwise increased her *ability* to earn since the time of the divorce, only that her actual income has increased."

¶30   And with regard to Jacob, the court found that he had voluntarily left his job in the oil fields, and that he "remains able to earn income at the level he was earning" before. On that basis, the court imputed to Jacob income of $8,233 per month, despite the fact that Jacob was no longer earning that amount. Jacob takes no issue with this imputation determination on appeal.

¶31   The court then completed its analysis by stating as follows: "[Amy's] financial needs and both parties' ability to earn has not changed since the time the stipulated decree was entered. Therefore, [Jacob's] Petition to Modify the alimony ordered in the decree is DENIED."

¶32   In our view, the court was, at least to some extent, conflating the "changed circumstances" part of the analysis with the "*Jones* factors" part of the analysis. Its first mistake was failing to make a specific finding regarding Amy's reasonable monthly needs. As noted, no such finding had been made in connection

with the 2018 decree, and Amy had submitted two conflicting financial declarations since then. In order to complete the multi-factor alimony analysis mandated by the court's unchallenged conclusion that circumstances had materially changed, the court needed to make an actual finding regarding Amy's expenses.[6]

¶33 The next error the court made was in determining that Amy's earning capacity had not changed, even though her income had. And here, it is important to differentiate between situations in which a spouse's income goes *down* from situations in which a spouse's income goes *up*. Certainly, where a spouse's income goes down, it does not necessarily follow—indeed, it often does not follow—that the spouse's earning capacity has also gone down; in such situations, courts retain the discretion to determine that, even though a spouse's income has gone down, his or her earning capacity has not been diminished, and to impute to the spouse— for instance, on the basis of a finding of voluntary underemployment—an income in line with the unchanged earning capacity. *See, e.g.*, *Olson v. Olson*, 704 P.2d 564, 566 (Utah 1985) (stating that where parties "experience[] a temporary decrease in income, [their] historical earnings must be taken into account in determining the amount of alimony to be paid");

---

6. Amy argues that the "facts concerning [her] financial needs and conditions are clear from the record," and on that basis urges us to excuse the court's failure to make a specific finding. We disagree with the premise of Amy's argument. At trial, Amy testified that her expenses had stayed the same since May 2018, but there was no 2018 figure to which Amy's testimony could be compared. Moreover, after 2018, Amy submitted two conflicting financial declarations and, at trial, Jacob's attorney established that Amy was then living alone rather than with one or more of the parties' children. We therefore agree with Jacob that the evidence in the record regarding Amy's expenses was sufficiently conflicting as to be significantly less than "clear."

*Pankhurst v. Pankhurst*, 2022 UT App 36, ¶¶ 14–15, 508 P.3d 612 (noting that "a finding of voluntary underemployment is *not* a prerequisite to imputing income," and affirming a trial court's determination to assess the payor spouse's income at a higher level than his current income because the current lower income was "temporary" (quotation simplified)); *Gerwe v. Gerwe*, 2018 UT App 75, ¶ 31, 424 P.3d 1113 (crediting a trial court's skepticism about a payor spouse's sudden drop in income where the spouse "came into trial making a huge amount of money . . . and then all of a sudden is making no money because, you know, now it's time to pay somebody" (quotation simplified)). Indeed, the district court made precisely such a finding with regard to Jacob, and no party takes issue with that finding here on appeal.

¶34 But the fact that a spouse's income has gone *up* is very strong evidence that the spouse's earning capacity has also risen. A party who is actually earning $45,000 per year will nearly always properly be deemed to have the capacity to earn at least that amount. There are, of course, exceptions: in some isolated instances, an increase in income is temporary and does not reflect an overall or long-term increase in earning capacity. *See English v. English*, 565 P.2d 409, 412 (Utah 1977) (stating that, when parties "experience[] unusual prosperity during one year," that unusual income figure is not necessarily indicative of earning capacity); *see also, e.g.*, *Woskob v. Woskob*, 2004 PA Super 37, ¶ 28, 843 A.2d 1247 (holding that a spouse's earning capacity, moving forward, was not reflected by three "retroactive salary bonuses" that were not likely to occur in the future, and stating that, since the spouse's "elevated salary during [the] period [in which he received those bonuses] is totally disproportionate to his actual earning capacity, his support obligation should reflect his earning capacity rather than his actual earnings"). But before concluding that a spouse's earning capacity is *less than* the spouse's actual income, a court should have evidence that the spouse's higher income is truly ephemeral and not indicative of long-term earning capacity.

¶35 No such evidence is present here. Amy has obtained a full-time salaried position that pays her a steady income of $45,000 per year. There is no indication that this job is only temporarily available to her. The evidence was undisputed that Amy's earning capacity, moving forward, has increased, as exemplified by her new job; indeed, she testified that she has "the ability to earn at least $3,750 a month" at that job, and that she would be able to "do that moving forward." The district court's observation that Amy had not "obtained extra education" in an effort to grow her earning capacity is true as far as it goes. But even in the absence of any extra education or training, a spouse's earning capacity can rise, and a spouse's ability to obtain and maintain a salaried job is an extremely strong piece of evidence so indicating.

¶36 We certainly take the court's point that the *reason* Amy felt compelled to find additional employment was because Jacob made the decision to quit his job and pay her less in alimony. In the court's view, Jacob's decision "forc[ed]" Amy "to find additional employment." We take no issue with the court's observation that the law should not incentivize payor spouses to become voluntarily underemployed. But we do not think the law contains any such incentive; indeed, the customary (and presumably adequate) remedy for such behavior is for the court—where appropriate, and as the court did here—to find the payor spouse underemployed and impute to that spouse an income commensurate with the previous salary.[7]

---

7. Moreover, we do not think it inappropriate, in the abstract, for payee spouses to make an effort to enter the workforce, and thereby pursue a higher standard of living and a greater degree of independence from the payor spouse. We recognize that many spouses who have long been out of the workforce may find it difficult to reenter it, with or without additional education or training; generally speaking, our law does not *require* payee

(continued…)

¶37 Thus, we conclude that the district court erred in its analysis of Amy's earning capacity. It erroneously determined that Amy's earning capacity had not changed. And based on this determination, it stopped short of making a specific finding as to what Amy's new earning capacity was, taking into account her new full-time job and, if appropriate, her part-time side endeavors. *See Degao Xu v. Hongguang Zhao*, 2018 UT App 189, ¶ 31, 437 P.3d 411 ("When determining an alimony award, it is appropriate and necessary for a trial court to consider all sources of income that were used by the parties during their marriage to meet their self-defined needs, including income from a second job." (quotation simplified)). The court should remedy these errors on remand, and should complete the calculation regarding Amy's expenses and earning capacity, thus answering the question Jacob raises, namely, whether Amy has the ability to take care of her own needs through her own income.

¶38 Finally, the court's analysis regarding Jacob's ability to provide support was also incomplete, and will require additional analysis in the event the court concludes that Amy is not completely able to pay for all of her reasonable monthly needs. *See Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 42, 402 P.3d 219 ("[I]f the court finds that the recipient spouse is not able to meet her own needs, then it should assess whether the payor spouse's income, after meeting his needs, is sufficient to make up some or all of the shortfall between the recipient spouse's needs and

spouses in that situation to attempt to reenter the workforce in ways incongruous with their employment history. But a spouse who, whether by chance or perseverance, manages to gain a foothold in the workforce after a long absence may very well benefit from the experience; as we see it, our law should encourage self-sustainability and independence. Accordingly, we do not necessarily view—as the district court seemed to—the outcome of Amy's employment journey to be an unfortunate one.

income." (quotation simplified)). As already noted, the court imputed to Jacob a monthly income of $8,233, based on a finding of voluntary underemployment, and that determination is not challenged on appeal. But in order to compute Jacob's ability to provide support to Amy to cover any determined shortfall, the court will need to compute Jacob's reasonable monthly expenses, *see Rehn*, 1999 UT App 41, ¶ 10 ("To be sufficient, the findings should also address the obligor's needs and expenditures, such as housing, payment of debts, and other living expenses." (quotation simplified)), which the court did not endeavor to do in its order.

¶39 As to whether a shortfall exists, the parties take divergent positions on appeal. Jacob asserts that no shortfall exists, and that Amy is able to pay all of her own reasonable monthly expenses. Amy, for her part, contends that even with her newly increased income she still has "a shortfall of over $1,800." But Jacob's alimony obligation ($2,300) apparently exceeds even Amy's current calculation of her shortfall; under Amy's computation of expenses, then, Jacob would still be entitled to at least some modification of his alimony obligation. On remand, the district court should run this complete calculation, making specific findings on each of the relevant factors, and should determine the extent to which Jacob's alimony obligation should be modified.

CONCLUSION

¶40 The district court did not apply the proper legal analysis to Jacob's petition to modify, and erred when it concluded that Amy's earning capacity had not changed. We reverse the court's denial of Jacob's petition to modify, and remand this case for further proceedings consistent with this opinion.

―――――――